IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
March 4, 2015 Session

## MICHELLE RYE ET AL. v. WOMEN'S CARE CENTER OF MEMPHIS, MPLLC ET AL.

**Appeal by Permission from the Court of Appeals, Western Section
Circuit Court for Shelby County
No. CT00092009      Gina C. Higgins, Judge**

_____

**No. W2013-00804-SC-R11-CV – Filed October 26, 2015**

_____


GARY R. WADE, J., concurring in part and dissenting in part.

The majority opinion accurately recounts the development of this area of the law but ultimately concludes that the summary judgment standard first articulated in Byrd v. Hall, 847 S.W.2d 208 (Tenn. 1993), and later refined in Hannan v. Alltel Publishing Co., 270 S.W.3d 1 (Tenn. 2008), and other decisions of this Court, must now be overruled. In my view, the principles articulated in Hannan, when interpreted in light of the history of summary judgment in Tennessee, set forth the preferable standard for shifting the burden of proof at summary judgment—one that is fully consistent with Tennessee Rule of Civil Procedure 56. By granting Rule 11 review in a case which pre-dated the passage of a statute purporting to set a new standard for summary judgment, by rejecting the well-established doctrine of stare decisis, and by acquiescing to the standard proposed by the General Assembly, my colleagues have preempted the future consideration of an important constitutional issue—whether the General Assembly, by its enactment of Tennessee Code Annotated section 20-16-101 (Supp. 2014), has violated the separation-of-powers doctrine.[1] In the interest of consistent, predictable procedural guidelines of adjudication, I would hold that Byrd, Hannan, and their progeny should be reaffirmed as the standard for summary judgment in Tennessee and should be applied to the facts before us. Moreover, in my assessment, even the federal standard, as adopted in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), does not warrant dismissal on all of the claims. I must, therefore, respectfully dissent.

---

[1] More to the point, I would not have granted the Defendants permission to appeal in the first place. Because section 20-16-101 does not apply to the Ryes' claim, the Court of Appeals applied the correct standard for summary judgment, and neither of the parties raised on appeal the continued vitality or wisdom of the Byrd/Hannan standard.

**I. Summary Judgment in Tennessee**

The summary judgment standard articulated by this Court in <u>Hannan</u> has been accurately summarized as follows:

> When a motion for summary judgment is made, the moving party has the burden of showing that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The moving party may accomplish this by either: (1) affirmatively negating an essential element of the non-moving party's claim; or (2) **showing that the non-moving party will not be able to prove an essential element at trial. However, it is not enough for the moving party to challenge the non-moving party to "put up or shut up" or even to cast doubt on a party's ability to prove an element at trial**. If the moving party's motion is properly supported, the burden of production then shifts to the non-moving party to show that a genuine issue of material fact exists. The non-moving party may accomplish this by: (1) pointing to evidence establishing material factual disputes that were overlooked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for the trial; or (4) submitting an affidavit explaining the necessity for further discovery. . . .

<u>Rye v. Women's Care Ctr. of Memphis, MPLLC</u>, No. W2013-00804-COA-R9-CV, 2014 WL 903142, at *5 (Tenn. Ct. App. Mar. 10, 2014) (emphasis added) (alterations, citations, and internal quotation marks omitted). These principles of summary judgment have a long-standing foundation in Tennessee jurisprudence, as confirmed in 1993 with this Court's ruling in <u>Byrd</u>, as reaffirmed in 1998 by <u>McCarley v. West Quality Food Service</u>, 960 S.W.2d 585 (Tenn. 1998), and as refined in 2008 by our decision in <u>Hannan</u>, as well as other more recent cases.[2] Today, less than seven years after the <u>Hannan</u> decision and more than twenty years since <u>Byrd</u>, my colleagues have reversed field, observing that our summary judgment standard is "incompatible with the history and text

---

[2] Contrary to the majority's assertion, <u>Hannan</u> did not "fundamentally change[] summary judgment practice." In <u>Byrd</u>, this Court "reaffirm[ed] the summary judgment principles found in . . . Tennessee cases[,] . . . embrace[d] the construction of Rule 56 in [the <u>Celotex</u> line of federal cases] to [some] extent," and made several "observations to place a finer point on the proper use of the summary judgment process in this state." <u>Byrd</u>, 847 S.W.2d at 214. While <u>Hannan</u> later served to clarify <u>Byrd</u>'s use of the term "affirmative defense," the standard otherwise remained unchanged. See <u>Hannan</u>, 270 S.W.3d at 6-7.

of Tennessee Rule [of Civil Procedure] 56" and "frustrate[s] the purposes for which summary judgment was intended." The majority opinion suggests that by adding the words "at trial" to the second prong of the Byrd/Hannan standard, the Court improperly moved the focus away from the evidence adduced at the summary judgment stage and onto "hypothetical evidence that theoretically could be adduced, **despite the passage of discovery deadlines**, at a future trial." (Emphasis added.) Ultimately, the majority has concluded that the Byrd/Hannan standard "has shifted the balance too far and imposed on parties seeking summary judgment an almost insurmountable burden of production." I disagree on all counts.

In my view, the majority opinion is based upon an erroneous premise—a faulty interpretation of Hannan that appears to have originated in an unpublished decision by our Court of Appeals, in which there was no application for permission to appeal to this Court. In White v. Target Corp., the Western Section of the Court of Appeals criticized by footnote the Hannan ruling, speculating that the standard requires trial courts to assume future hypothetical facts at the summary judgment stage. No. W2010-02372-COA-R3-CV, 2012 WL 6599814, at *7 n.3 (Tenn. Ct. App. Dec. 18, 2012). The footnote, which failed to include any authority supportive of its interpretation, provides as follows:

> Under Hannan, as we perceive the ruling in that case, it is not enough to rely on the nonmoving party's lack of proof **even where, as here, the trial court entered a scheduling order and ruled on the summary judgment motion after the deadline for discovery had passed**. Under Hannan, we are required to assume that the nonmoving party may still, by the time of trial, somehow come up with evidence to support her claim.

Id. (emphasis added); see also Boals v. Murphy, No. W2013-00310-COA-R3-CV, 2013 WL 5872225, at *5 (Tenn. Ct. App. Oct. 30, 2013). Until now, this Court has never endorsed the correctness of the Target footnote.[3] In my view, the better course would have been to simply reject the interpretation advanced by the Target footnote, reaffirm

---

[3] Since that footnote was written, this interpretation of Hannan has been cited by seventeen Court of Appeals opinions, including Rye, all of which are unpublished. In eleven of those cases, neither party sought permission to appeal to this Court. See Tenn. R. App. P. 11. In one of those cases, a Rule 11 application was filed but the appeal was withdrawn and dismissed before this Court reviewed it. In another, a Rule 11 application was filed but the Target court's interpretation of Hannan was not raised as an issue on appeal. Finally, three of the cases have Rule 11 applications pending our decision in this case.

- 3 -

the Byrd/Hannan standard, and capitalize upon this opportunity to clarify the rationale for the differences between Tennessee and federal summary judgment jurisprudence.[4]

Even if it is true, as the majority concludes, that "nothing in the history or text of Tennessee Rule [of Civil Procedure] 56 . . . **necessitates rejecting** the [federal] standard[]" for summary judgment, neither does anything in the history or text of our Rule 56 **require adopting** the federal standard. (Emphasis added.)[5] We have consistently rejected federal rules that are contrary to "the strong preference embodied in the Tennessee Rules of Civil Procedure that cases . . . be decided on their merits," and have afforded appropriate recognition to "the Tennessee constitutional mandate that 'the right of trial by jury shall remain inviolate.'" Webb v. Nashville Area Habitat for Humanity, Inc., 346 S.W.3d 422, 432 (Tenn. 2011) (quoting Tenn. Const. art. I, § 6) (citing Jones v. Prof'l Motorcycle Escort Serv., L.L.C., 193 S.W.3d 564, 572 (Tenn. 2006)); cf. State v. Bennett, No. 01C01-9607-CC-00139, 1998 WL 909487, at *11 (Tenn. Crim. App. Dec. 31, 1998) (Wade, J., concurring) ("Because the right to trial by jury is too precious to abridge, . . . I would tend to trust a well-informed jury, which has seen and heard firsthand of the quantity and quality of the evidence, rather than an impartial tribunal of judges exposed only to the written record of the trial. . . . I am unwilling to denigrate the importance of the right to a jury of peers[;] . . . [t]hat is too great a sacrifice . . . .").[6] As stated, this Court first rejected the federal standard in Byrd and continued to

---

[4] In fact, at oral argument before this Court, counsel for the Defendants conceded that the Target footnote was an erroneous interpretation of Hannan and that the Court would not need to overrule Hannan in order to render a judgment in favor of the Defendants.

[5] Contrary to the assertion by the majority, I do not mean to imply that Tennessee law **requires** the rejection of the federal Celotex standard. The fact remains, however, that we have consistently applied our own summary judgment standard for the last twenty-two years, and the majority has not articulated any principled reason to suddenly abandon that practice now in favor of the federal standard.

[6] While I recognize that civil cases may be technically decided "on the merits" before going to trial, such as where there are no material facts in dispute and the issues can be resolved by a trial judge as a matter of law, the Tennessee Constitution and the Tennessee Rules of Civil Procedure clearly favor the right to trial by jury and, therefore, fully support the adoption of a summary judgment standard which places a heavier burden on parties who "want out of [a] lawsuit on the merits short of a trial." Judy M. Cornett, Trick or Treat? Summary Judgment in Tennessee After *Hannan v. Alltel Publishing Co.*, 77 Tenn. L. Rev. 305, 343-44 (2010) [hereinafter Cornett, 77 Tenn. L. Rev.]; see also id. at 338 ("Tennessee has traditionally favored merits-based determinations over efficiency. As we have seen, even in its limited precursors to summary judgment, Tennessee jurisprudence was highly skeptical of deciding any issue on the papers alone."); id. at 349 ("Tennessee's long-standing tradition of preferring merits-based determinations to efficiency considerations would probably loom large in the [Supreme C]ourt's reasoning [for rejecting the federal standard]. Given Tennessee's strong constitutionally based right to

do so in numerous cases thereafter. See Cornett, 77 Tenn. L. Rev. at 317 ("[I]n the almost fifteen years between Byrd and the trial court's decision in Hannan, the Tennessee Court of Appeals generally interpreted Byrd correctly as rejecting the [federal] 'put up or shut up' standard.").[7] In Hannan, we confirmed that "we began our departure from the federal standard" in Byrd, explaining the distinction between the two interpretations as follows:

> Th[e] second method of shifting the burden of production outlined in the Byrd opinion . . . differs significantly from [the federal standard's]

trial by jury in civil cases, the [Supreme C]ourt might also be concerned not to adopt a procedure that would encroach on the province of the jury.").

[7] In the twenty-two years since Byrd was decided, that decision has been cited with approval in over 100 opinions by this Court, many of which were joined or authored by a majority of the current members of this Court. Since Hannan was decided in October of 2008, a majority of our current members has approved of the summary judgment standard in over twenty of our own opinions. See Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc., 395 S.W.3d 653 (Tenn. 2013); Himmelfarb v. Allain, 380 S.W.3d 35 (Tenn. 2012); Perkins v. Metro. Gov't of Nashville & Davidson Cnty., 380 S.W.3d 73 (Tenn. 2012); Fed. Ins. Co. v. Winters, 354 S.W.3d 287 (Tenn. 2011); Starr v. Hill, 353 S.W.3d 478 (Tenn. 2011); Kiser v. Wolfe, 353 S.W.3d 741 (Tenn. 2011); Kiser, 353 S.W.3d at 750 (Lee, J., concurring in part & dissenting in part); Shipley v. Williams, 350 S.W.3d 527 (Tenn. 2011); Sykes v. Chattanooga Hous. Auth., 343 S.W.3d 18 (Tenn. 2011); Estate of French v. Stratford House, 333 S.W.3d 546 (Tenn. 2011); Sherrill v. Souder, 325 S.W.3d 584 (Tenn. 2010); Davis v. McGuigan, 325 S.W.3d 149 (Tenn. 2010); Davis, 325 S.W.3d at 167 (Koch, J., dissenting); Shelby Cnty. Health Care Corp. v. Nationwide Mut. Ins. Co., 325 S.W.3d 88 (Tenn. 2010); Gossett v. Tractor Supply Co., 320 S.W.3d 777 (Tenn. 2010); Gossett, 320 S.W.3d at 789 (Clark, J., concurring in part & dissenting in part); Kinsler v. Berkline, LLC, 320 S.W.3d 796 (Tenn. 2010); Kinsler, 320 S.W.3d at 802 (Clark, J., concurring in part & concurring in the judgment); Cox v. M.A. Primary & Urgent Care Clinic, 313 S.W.3d 240 (Tenn. 2010); In re Estate of Davis, 308 S.W.3d 832 (Tenn. 2010); Home Builders Ass'n of Middle Tenn. v. Williamson Cnty., 304 S.W.3d 812 (Tenn. 2010); Mills v. CSX Transp., Inc., 300 S.W.3d 627 (Tenn. 2009); Stanfill v. Mountain, 301 S.W.3d 179 (Tenn. 2009); Giggers v. Memphis Hous. Auth., 277 S.W.3d 359 (Tenn. 2009); Martin v. Norfolk S. Ry., 271 S.W.3d 76 (Tenn. 2008).

The U.S. Supreme Court has explained the importance of adherence to precedent:

Stare decisis is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process. Adhering to precedent "is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than it be settled right." Burnet v. Coronado Oil & Gas Co., 285 U.S. 393, 406 (1932) (Brandeis, J., dissenting).

Payne v. Tennessee, 501 U.S. 808, 827 (1991) (citation omitted).

second method of burden-shifting. The opinion in <u>Byrd</u> requires a moving party to demonstrate that the nonmoving party **cannot establish** an essential element of the claim at trial. [The federal standard], however, would give the moving party the easier burden of demonstrating that the nonmoving party's **evidence**—at the summary judgment stage—is **insufficient** to establish an essential element. Therefore, the standard we adopted in <u>Byrd</u> clearly differs from [the federal] standard and poses a heavier burden for the moving party.

<u>Hannan</u>, 270 S.W.3d at 7 (citations omitted). Importantly, the emphasis of the Court in <u>Hannan</u> was not on the difference between the phrases "at trial," as used in the Tennessee standard, and "at the summary judgment stage," as used in the federal standard. Instead, the <u>Hannan</u> Court embraced the concept of adjudication on the merits, pointing out that in Tennessee the moving party cannot shift the burden to the non-moving party by merely asserting that the non-moving party "**lacks evidence** to prove an essential element of its claim." <u>See</u> <u>id.</u> at 8 (emphasis added).

One law review article has offered the following explanation:

Clearly, in articulating th[e] [second method for] shifting the burden to the nonmovant, **the Tennessee Supreme Court rejected the federal approach to summary judgment as a way of testing the sufficiency of the nonmovant's evidence pre-trial**. **In Tennessee, the movant has to produce negative evidence or has to somehow show that, at the time of trial, the nonmovant will be unable to prove an essential element of the claim.** It is utterly insufficient in Tennessee for a movant to merely allege that the plaintiffs' evidence **at that stage** is insufficient to prove an essential element of its case.

Cornett, 77 Tenn. L. Rev. at 334 (emphasis added) (footnotes omitted). As suggested by several commentators, the second prong of <u>Hannan</u> requires the moving party to do more than point to omissions in the non-moving party's proof or cast doubt on the non-moving party's evidence; instead, the moving party must affirmatively "show [at the summary judgment stage] that something is **impossible** [at trial]." <u>Id.</u> at 334 n.198 (emphasis added). One of our esteemed trial judges "has suggested [to moving parties] that this alternative could be satisfied by showing that the pretrial order prohibits presentation of certain evidence at trial, usually because evidence was obtained too late." <u>Id.</u> (citing Notes by Judy Cornett from presentation by Chancellor Daryl Fansler, Knox County Chancery Court, *Hannan v. Alltel*-Is Summary Judgment Dead?, Continuing Legal Education program at East Tennessee Lawyers Association for Women, Knoxville, Tennessee (Sept. 16, 2009) (on file with the Tennessee Law Review)); <u>accord</u> <u>McDaniel</u>

v. Rustom, No. W2008-00674-COA-R3-CV, 2009 WL 1211335, at *13-15 (Tenn. Ct. App. May 5, 2009). Commentators have agreed that the second prong of Hannan encourages defendants in civil cases to "strive for greater use of pretrial orders with firm cut-off dates for completion of discovery and exchange of evidence." Cornett, 77 Tenn. L. Rev. at 334 n.198.[8] In my view, this interpretation of the Byrd/Hannan standard fully comports with Tennessee Rule of Civil Procedure 56—on the one hand providing the opportunity for a summary dismissal of a baseless claim, and, on the other, protecting the right to a jury trial on the merits when there are material facts in dispute.[9]

Finally, Hannan should not have been read to require courts "to assume that the nonmoving party may still, by the time of trial, somehow come up with evidence to support her claim." Target Corp., 2012 WL 6599814, at *7 n.3. Otherwise, literally every summary judgment motion would be denied under the second prong of Hannan. Of course, that has not been the case since the Hannan ruling. Summary judgment continues to be regularly granted in favor of the party which does not bear the burden of proof at trial. The case before us illustrates that very point. The trial court and our Court of Appeals applied the Byrd/Hannan standard and yet still granted partial summary judgment to the Defendants.[10]

---

[8] Proceeding under the second prong may require a moving party to delay the filing of a motion for summary judgment until discovery has been completed or the discovery deadlines have passed, unlike instances in which a moving party is able to file a motion for summary judgment earlier in the proceedings by affirmatively negating an essential element of the claim; nevertheless, the burden can easily be shifted under the second prong of Hannan by the use of strict discovery deadlines.

[9] The majority criticizes this interpretation of the Byrd/Hannan standard, observing that "[c]onspicuously absent from Tennessee Rule [of Civil Procedure] 56 is any language requiring the moving party to seek, obtain, and comply with a scheduling order before moving for summary judgment, although, according to the dissent, Hannan imposed this obligation." In my assessment, this statement by the majority is both misleading and irrelevant. First, the use of scheduling, planning, and pre-trial orders is already governed by Tennessee Rule of Civil Procedure 16, so there would be no need for Rule 56 to reiterate these procedures. Second, I have not suggested that Hannan "imposed" a scheduling order "obligation." Our summary judgment standard allows the moving party to shift the burden by demonstrating that, for whatever reason, the non-moving party "will not be able to prove an essential element at trial." Rye, 2014 WL 903142, at *5. Failure to comply with a scheduling order is simply one way to meet this standard. Third, while I recognize that our opinion in Hannan did not clearly articulate with precision just how the second prong was intended to work in practice, the nature of the common law is development on a case-by-case basis. It is not at all unusual for one decision to leave room for later interpretation. Just as this Court used the Hannan decision to clarify the term "affirmative defense" from Byrd, I would take this opportunity to clarify the application of the second prong of Hannan.

[10] I do not take lightly "our obligation to correct erroneous court-made rules," if the circumstances are appropriate to do so. See, e.g., State v. Collier, 411 S.W.3d 886, 899-900 (Tenn. 2013) (Wade, C.J.) (overruling more than twenty years of common law which embraced the minority rule that

## II. Application of the <u>Byrd</u>/<u>Hannan</u> Standard in this Case

On February 24, 2009, Mr. and Mrs. Rye filed a health care liability action against the Defendants, alleging various injuries as a result of the Defendants' failure to administer a timely RhoGAM injection to Mrs. Rye during the third trimester of her third pregnancy. In a health care liability action, a plaintiff is required to prove each of the following elements:

> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
>
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
>
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a) (2012).[11] In this instance, the first two elements are present. As to the third element, it is undisputed that the Defendants' negligence in failing to administer a timely RhoGAM injection resulted in Mrs. Rye's becoming Rh-sensitized, which is an irreversible condition that affects the antibodies present in Mrs.

---

the victim of a statutory rape qualifies as an accomplice to the crime). It is well established, however, that the principle of stare decisis dictates that we only change the law when absolutely necessary. In my view, the summary judgment standard in Tennessee does not require correction, except to the extent that it has been misinterpreted by the unfortunate footnote in <u>Target</u>. Moreover, aside from the purely anecdotal account of Justice Bivins covering a day in his tenure as a trial judge, neither the majority opinion nor the separate opinions have produced any data whatsoever indicating a significant decrease in the percentage of summary judgments granted after <u>Hannan</u>. In consequence, my colleagues have failed to substantiate their assertion that the Tennessee summary judgment standard has proved to be "unworkable." Simply put, any confusion as to the application of the <u>Hannan</u> standard is the result of a fundamental misunderstanding of that decision—a misunderstanding now perpetuated, rather than corrected, by the majority.

[11] At the time the Ryes filed their complaint, "health care liability" actions were still referred to as "medical malpractice" actions. In 2012, section 29-26-115(a), along with numerous other sections in the Code, was amended to replace the term "malpractice" with "health care liability." <u>See</u> Act of Apr. 23, 2012, ch. 798, § 7, 2012-2 Tenn. Code Ann. Adv. Legis. Serv. 274, 274 (LexisNexis). The substantive elements of the statute remained unchanged.

Rye's blood.[12] The only issue is whether the Ryes have suffered or will suffer injury "which would not otherwise have occurred." Tenn. Code Ann. § 29-26-115(a)(3). In support of their claims, the Ryes classified their injuries as follows: (1) physical injuries to Mrs. Rye, "including disruption of the normal functioning of [Mrs. Rye's] capability to conceive unimpaired, healthy children, free from an abnormally high risk of birth defects or premature fetal death"; (2) disruption of family planning; (3) infliction of emotional distress upon Mrs. Rye; (4) infliction of emotional distress upon Mr. Rye; (5) future medical expenses likely to be incurred by Mrs. Rye for any future pregnancies; and (6) future medical expenses likely to be incurred by Mrs. Rye for any future blood transfusions.

On March 10, 2011, the trial court entered a scheduling order pursuant to Tennessee Rule of Civil Procedure 16. As is relevant to this appeal, the scheduling order required the Ryes to disclose their expert witnesses by May 1, 2011; all discovery depositions were to be completed by September 1, 2011; dispositive motions were to be filed by December 1, 2011; and trial was scheduled for February 6, 2012. On July 15, 2011, prior to the completion of discovery, the trial court held a hearing on the Defendants' motion to dismiss or, in the alternative, for summary judgment. At that time, the trial court was provided with the depositions of the Ryes and the Defendants, as well as competing affidavits from expert witnesses to support each side. On August 10, 2011, the trial court entered a written order granting the Defendants a partial summary judgment; in particular, the trial court granted the Defendants' motion as to "all claims for future damages for injuries to [Mrs.] Rye that relate to prospective injury relating to blood transfusions or future pregnancies."

On January 24, 2012, almost four months after the discovery deadlines had passed, the Defendants renewed their request for summary judgment on the Ryes' remaining claims for damages. On the morning of the trial, the trial court granted partial summary judgment for the Defendants as to Mr. Rye's stand-alone claim for negligent infliction of emotional distress and as to the Ryes' stand-alone claim for disruption of family planning. The trial was postponed. In an order entered several months later, the trial court ruled that the Ryes could proceed to trial on only two disputed issues of material

---

[12] If an individual with Rh-negative blood becomes sensitized to Rh-positive blood, this individual will develop antibodies to Rh-positive blood. The exposure to Rh-positive blood in an Rh-negative woman most commonly occurs during blood transfusions and pregnancies. If an Rh-sensitized woman becomes pregnant with an Rh-positive fetus, the antibodies in the woman's Rh-negative blood will attack and destroy the fetus' red blood cells. Dr. Linda Burke-Galloway, RhoGAM Shot During Pregnancy, Pregnancy Corner, http://www.pregnancycorner.com/being-pregnant/health-nutrition/rhogam.html (last updated June 2014).

fact: (1) whether Mrs. Rye had sustained a compensable physical injury as a result of the Defendants' failure to administer a timely RhoGAM injection, and (2) whether Mrs. Rye had suffered emotional distress as a result of the Defendants' conduct. The trial court also ruled that the Ryes would be allowed to present evidence of the disruption of their family planning as an element of damages related to Mrs. Rye's claim of emotional distress.

On interlocutory appeal, the Court of Appeals, Western Section, reversed in part and affirmed in part. Rye, 2014 WL 903142, at *1. Specifically, the Court of Appeals affirmed the trial court's grant of summary judgment to the Defendants on the Ryes' stand-alone claim for disruption of family planning and Mrs. Rye's claim for future medical expenses associated with any future blood transfusions, but reversed the trial court's grant of summary judgment on Mrs. Rye's claim for future medical expenses associated with any future pregnancies. Id. at *9, *16. Further, applying the literal interpretation of "at trial" as expressed in the Target footnote and despite the fact that discovery had come to an end, the Court of Appeals reversed the grant of summary judgment for the Defendants on Mr. Rye's stand-alone claim for emotional distress, a determination which was based on the theory that he might be able to produce supportive expert testimony by the time of trial. Id. at *23-24. The effect of the ruling was that the Ryes could proceed to trial on four disputed issues: (1) whether Mrs. Rye had sustained a compensable physical injury as a result of the Defendants' failure to administer a timely RhoGAM injection; (2) whether Mrs. Rye had suffered emotional distress as a result of the Defendants' conduct; (3) whether Mr. Rye had suffered emotional distress as a result of the Defendants' conduct; and (4) whether Mrs. Rye was entitled to future medical expenses related to any future pregnancies. Id. at *1, *24.

Pursuant to the Celotex/federal standard for burden-shifting at the summary judgment stage, my colleagues have concluded that the Defendants are entitled to summary judgment on each of the Ryes' claims. In my view, however, application of either the Byrd/Hannan standard or the federal standard would warrant summary judgment on only three of the six injuries alleged in the original complaint: (1) disruption of family planning as a stand-alone claim; (2) Mr. Rye's stand-alone claim for emotional distress; and (3) Mrs. Rye's future medical expenses related to future blood transfusions. I believe that there exist genuine issues of material fact as to the three remaining claims, all of which should proceed to a trial on the merits: (1) whether Mrs. Rye's condition of Rh-sensitization has caused her harm in the form of a present physical injury; (2) whether Mrs. Rye's Rh-sensitization has caused her harm in the form of emotional distress; and (3) whether Mrs. Rye's Rh-sensitization is reasonably certain to cause her prospective harm related to future pregnancies.

**A. Rh-Sensitization as a Present Physical Injury**

- 10 -

Although several federal and state courts have already recognized the viability of such a claim, the question of whether Rh-sensitization qualifies as a compensable injury is a matter of first impression in Tennessee. The record in this case includes conflicting affidavits and deposition testimony from medical experts as to whether Mrs. Rye has suffered a compensable physical injury in the form of Rh-sensitization, irrespective of any future medical expenses related to future pregnancies or blood transfusions. My colleagues, however, have narrowed the scope of this issue to the hypothetical, determining that "even [if] Mrs. Rye's Rh-sensitization amounts to a physical injury, the dispositive question is . . . whether Mrs. Rye is reasonably certain to sustain damages for future medical expenses as a result of her Rh-sensitization."[13] Focusing only upon future medical expenses and prospective harm to Mrs. Rye, the majority answers this question in the negative and, therefore, grants summary judgment. I cannot agree. In my view, this Court, as federal courts and the courts of other states have done, should recognize the cause of action, and a jury should be permitted to resolve the disputed issue of whether Mrs. Rye has a compensable physical injury as a result of her altered blood status and decreased ability to bear children without serious medical complications—an irreversible condition from which Mrs. Rye would not suffer but for the failure of the Defendants to administer a timely RhoGAM injection.

Other jurisdictions have already considered whether this condition qualifies as an injury justifying the recovery of physical damages. In <u>Kenyon v. Hammer</u>, for example, Sharon Kenyon filed a medical malpractice action against a physician who had failed to administer a necessary RhoGAM injection after the birth of her first child in 1972. 688 P.2d 961, 963 (Ariz. 1984). After the trial court granted summary judgment for the physician, Mrs. Kenyon argued on appeal that her injury did not arise—and, therefore, did not trigger the applicable statute of limitations—until the conception of her second child, who "was stillborn [in 1978] as a result of the destruction of its blood cells by [Mrs. Kenyon's] Rh antibodies." <u>Id.</u> at 963-64, 967. The Arizona Supreme Court recognized the cause of action but held that Mrs. Kenyon had sustained her injury in 1972 and, therefore, her claim was barred by the statute of limitations:

---

[13] The majority insists that it has not foreclosed the possibility of a claim based on Rh-sensitization as a present physical injury, under certain circumstances, because it is "assuming for purposes of this appeal that Rh-sensitization may qualify as a compensable injury so long as damages are proven to a reasonable certainty." Nowhere in the majority's analysis, however, is there a discussion of **presently existing damages** in the form of an altered bodily status or a decreased ability to bear children. Instead, the majority focuses solely on "whether Mrs. Rye is reasonably certain to sustain damages for **future medical expenses** as a result of her Rh-sensitization." (Emphasis added.)

> **When her doctor failed to administer RhoGAM within seventy-two hours of the birth of her first child, Mrs. Kenyon's physical condition changed for the worse because her ability to bear other children was significantly impaired.** She became more susceptible to just those problems which later occurred in the case at bench. If the [defendant] had realized the error four days after the birth of the first child . . . , he would have been bound to advise Mrs. Kenyon of the error and to have warned her of the risk of future pregnancy. Greater susceptibility to physical harm has been recognized as an element of damage in Arizona. **Certainly, if Mrs. Kenyon had known of her condition and consulted counsel shortly after the birth of her first child, an action could have been brought to recover damages for the decreased ability to bear children or increased risk of fetal fatality. That decreased ability or increased susceptibility is damage which will sustain a cause of action in tort.**

Id. at 967 (emphasis added) (citations omitted); see also DeStories v. City of Phoenix, 744 P.2d 705, 709 (Ariz. Ct. App. 1987) ("Mrs. Kenyon's 'greater susceptibility' was an identifiable, fully developed, present medical condition."). Likewise, in Harms v. Laboratory Corp. of America, the plaintiff's Rh-sensitization injury was described as follows:

> [Ms.] Harms suffers from Rh sensitization. Whether this condition causes her actual physical pain and suffering, **[she] has been permanently altered by this sensitization**. . . . **Thus, the court disagrees with Labcorp's characterization that [she] has not suffered a present physical injury**. . . . While injuries to a fetus—or emotional injuries suffered by [Ms.] Harms as a result of those injuries to a fetus—may not be recoverable at this time, the court finds that **[Ms.] Harms may still be entitled to recovery on injury—either physical or emotional—to herself**.

155 F. Supp. 2d 891, 910 (N.D. Ill. 2001) (emphasis added); see also Harris v. Brush Wellman Inc., No. 1:04cv598HSO-RHW, 2007 WL 5960181, at *12 (S.D. Miss. Oct. 30, 2007) (citing the holding in Harms that a "plaintiff suffering from Rh sensitization . . . has an actual injury regardless of the absence of current physical symptoms"); Alberg v. Ortho-Clinical Diagnostics, Inc., No. 98-CV-2006, 2000 WL 306701, at *3 (N.D.N.Y.

- 12 -

Mar. 24, 2000) (describing Rh-sensitization as an irreversible, undesired change in a person's physiology that "was designed to be prevented by RhoGam").[14]

In this instance, Mrs. Rye now suffers from Rh-sensitization as a result of the Defendants' negligent failure to administer a timely RhoGAM injection. Although the Defendants contend that Rh-sensitization is not a compensable injury, the Ryes have properly asserted this condition as a present physical injury in the form of an altered bodily status, despite the lack of current physical symptoms. The Ryes further contend that impairment to a woman's childbearing capability should be a recognized element of damages. As indicated, other jurisdictions have acknowledged the cause of action advanced by the Ryes and have recognized Rh-sensitization as a physical injury, entitling a claimant to recover for both physical and emotional damages if a claim is filed within the statute of limitations. In this instance, both the trial court and Court of Appeals recognized the viability of this claim. I agree. In my view, summary judgment for the Defendants is inappropriate pursuant to either the Celotex/federal standard or the Byrd/Hannan standard.

### B. Emotional Distress of Mrs. Rye

Because Mrs. Rye has alleged that she suffers from emotional distress as a "parasitic" consequence of her Rh-sensitization, she has not presented a stand-alone claim for negligent infliction of emotional distress and, under our law, is not required to prove the existence of emotional damages through expert medical testimony. See Estate of Amos v. Vanderbilt Univ., 62 S.W.3d 133, 136-37 (Tenn. 2001). Nevertheless, in order to succeed on this theory of damages, she must establish that she has "suffered a serious mental injury resulting from the [Defendants'] conduct." Rogers v. Louisville Land Co., 367 S.W.3d 196, 206 (Tenn. 2012). Our case law suggests that she may do so by presenting evidence of "unpleasant mental reactions such as . . . anger, chagrin, disappointment, and worry," along with "[e]vidence regarding the duration and intensity" of these symptoms, or by presenting "[o]ther evidence that the [Defendants'] conduct caused [her] to suffer significant impairment in . . . her daily functioning." Id. at 209-10.[15] Contrary to the assertion by the majority, such evidence may be established by the

---

[14] The factual differences in these cases, as pointed out by the majority in an attempt to undermine their applicability to the Ryes' circumstances, are completely irrelevant to the legal conclusion reached by each of these jurisdictions—that Rh-sensitization is an existing physical injury in and of itself, which gives rise to a cause of action at the time a physician fails to administer the necessary RhoGAM injection, irrespective of (although not exclusive to) any future harm that may be caused to the mother or the fetus.

[15] Other "nonexclusive factors" that may be considered in a claim for emotional distress include "[e]vidence of physiological manifestations of emotional distress" and "[e]vidence that the [claimant]

Ryes' own testimony and does not require proof that Mrs. Rye "sought emotional or psychiatric counseling or mental health treatment from a psychiatrist, a psychologist, a counselor, or anyone else." Cf. id. at 210; see also Miller v. Willbanks, 8 S.W.3d 607, 615 (Tenn. 1999).[16]

The deposition testimony of Mr. and Mrs. Rye fully supports the existence of Mrs. Rye's damages in the form of emotional distress and, in consequence, this issue should survive summary judgment, whether under the Byrd/Hannan standard or that adopted for the federal courts in Celotex. Mrs. Rye testified that immediately upon learning of her sensitized condition, which was clearly caused by the Defendants' conduct, she was simply "scared . . . to death." She described her painful reaction when one of her daughters, who had overheard the conversation with Mrs. Rye's physician, informed her grandmother that "mommy can't have any more babies or they'll die." Throughout her deposition, Mrs. Rye repeatedly described the level of her "concern" and "anxiety" upon learning of the serious risks to herself and her future children. She contended that she and her husband worry about the effects of Rh-sensitization "every single day," a condition that has affected her ability to have more children, as both she and her husband had planned throughout their marriage. As practicing Catholics, the Ryes cannot use any form of birth control for contraceptive purposes; in consequence, they must refrain altogether from sexual relations during ovulation because of the risks involved. Mrs. Rye described her relationship with her husband as "completely different" now that she is Rh-sensitized. She attested to daily anxiety, spelling out in some detail their concerns in the context of their religious beliefs, and their meetings with their priest. All of this evidence establishes a factual basis for an award of damages based on Mrs. Rye's emotional distress.

Under the Byrd/Hannan standard for summary judgment, the Defendants have failed to either negate Mrs. Rye's claim of emotional distress or otherwise establish that Mrs. Rye will be unable to prove her damages. Moreover, even by the federal standard, the Ryes' testimony creates a genuine issue of material fact as to whether Mrs. Rye suffered compensable emotional distress. See Rogers, 367 S.W.3d at 209-10. Her Rh-sensitization has adversely affected her fundamental right to bear and raise children. See

sought medical treatment, was diagnosed with a medical or psychiatric disorder . . . , and/or was prescribed medication." Id. at 210. "In certain instances, the extreme and outrageous character of the defendant's conduct is itself important evidence of serious mental injury." Id.

[16] Even if this were a requirement for proving an emotional distress claim, the Ryes both testified that they had sought advice and counseling from their priest, who surely would qualify as "anyone else" providing support services.

Eisenstadt v. Baird, 405 U.S. 438, 453 (1972) (describing "the decision whether to bear or beget a child" as "fundamental"); Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 541 (1942) ("Marriage and procreation are fundamental to the very existence and survival of the [human] race."). None of the Ryes' concerns would exist but for the failure of the Defendants to have administered a routine RhoGAM injection during Mrs. Rye's third pregnancy. Under either summary judgment standard, the evidence must be viewed in a light most favorable to the claims of the non-moving party, with all reasonable inferences drawn in favor of those claims. Celotex Corp., 477 U.S. at 330-31 & n.2 (Brennan, J., dissenting); Staples v. CBL & Assocs., Inc., 15 S.W.3d 83, 89 (Tenn. 2000). In my view, a reasonable juror could easily conclude that Mrs. Rye has suffered genuine and profound emotional distress. By granting summary judgment, however, my colleagues have precluded any consideration of the merits of this claim.

### C. Future Medical Expenses Related to Future Pregnancies

In Tennessee, a claimant may recover damages for future medical expenses related to a present injury if "the future effects [are] shown to be reasonably certain and not a mere likelihood or possibility." Potts v. Celotex Corp., 796 S.W.2d 678, 681 (Tenn. 1990). This means that "before a [claimant] may recover for potential injuries, there must be a reasonable degree of medical certainty that the [claimant] will develop a disease in the future as a result of an injury." Id. The terms "reasonably certain" and "reasonable degree of medical certainty" "require[] the [claimant] to prove that he or she will, **more probably than not**, need . . . medical services in the future." Singh v. Larry Fowler Trucking, Inc., 390 S.W.3d 280, 287 (Tenn. Ct. App. 2012) (emphasis added) (quoting Henley v. Amacher, No. M1999-02799-COA-R3-CV, 2002 WL 100402, at *13-14 (Tenn. Ct. App. Jan. 28, 2002)). While the **amount** of future damages is necessarily "speculative and imprecise" to some degree, "this imprecision is not grounds for excluding" evidence of the **existence** of future medical expenses that may be incurred. Overstreet v. Shoney's, Inc., 4 S.W.3d 694, 704 (Tenn. Ct. App. 1999).

In this instance, the Defendants have supported their motion for summary judgment with the affidavit and deposition of their expert witness, Dr. Thomas G. Stovall, who testified "within a reasonable degree of medical certainty that it is more likely than not that an Rh-sensitized individual will never sustain any injuries or damages whatsoever." Dr. Stovall further testified that "[t]he risks of any future injuries to [Mrs. Rye] or to a child in a future pregnancy, if such a child is conceived, are so remote that it cannot be stated with any reasonable degree of medical certainty that such injuries would in fact occur." In response, the Ryes submitted the affidavit and deposition of their expert witness, Dr. Joseph Bruner, who testified that "[c]ontrary to the opinions of Dr. Stovall, it is my opinion that it is more probable than not that unborn children of Mr. and Mrs. Rye will experience complications," including the "severe consequences" of Rh-sensitization such as a ruptured liver or spleen, excessive bleeding, permanent brain

- 15 -

damage, anemia, heart problems, and even fetal death. According to Dr. Bruner, if the child of an Rh-sensitized mother survives the pregnancy, it can develop "deafness, speech problems, cerebral palsy, or mental retardation." Dr. Bruner further testified that "it is more probable than not that Mrs. Rye's next pregnancy will involve a baby with moderate to severe disease in utero." More specifically, Dr. Bruner explained that "[w]ith [Mrs. Rye's] next R[h] incompatible pregnancy, . . . she **will** produce antibodies that **will** cross the placenta, and they **will** attach to the fetal red blood cells. And these red blood cells **will** be destroyed, and the fetus **will** experience some degree of anemia." (Emphasis added.) Finally, when asked by defense counsel during the deposition if he could "say that any of these things . . . are more likely than not going to occur to [Mrs. Rye] in the future," Dr. Bruner responded as follows:

> [Dr. Bruner:] It's more likely than not that she will become pregnant with another sensitized pregnancy.
>
> . . . .
>
> [Defense counsel:] And . . . more likely than not, it's going to be a child whose blood is not compatible with [Mrs. Rye's] R[h-sensitized] status. You're saying that's more likely than not, more than a 50 percent chance of that?
>
> [Dr. Bruner:] That's correct.
>
> . . . .
>
> So more likely than not, she will become pregnant again . . . . More likely than not, the fetus will be affected in at least one or more future pregnancies . . . . Over all, there's a 70 percent chance her pregnancy will be affected.
>
> . . . .
>
> It's more likely than not that she will become pregnant again. If she becomes pregnant again, based on what we know today, there's a 70 percent risk that the baby will be incompatible. It's more likely than not that baby will have moderate to severe disease and require invasive procedures.
>
> . . . .

Okay. So it's more likely than not, she'll become pregnant. It's more likely than not, the baby will be incompatible. It's more likely than not, the disease will be moderate to severe . . . .

My colleagues conclude that the Defendants are entitled to summary judgment on this issue because Mrs. Rye's "future medical expenses depend entirely upon contingencies that have not occurred and may never occur." Again, this is not the standard for the review of evidence at the summary judgment stage. See Staples, 15 S.W.3d at 89 ("[At the summary judgment stage,] [c]ourts must view the evidence in the light most favorable to the nonmoving party and must also draw all reasonable inferences in the nonmoving party's favor."). Our case law requires only that the claimant introduce expert testimony that future damages will "more probably than not" occur. Singh, 390 S.W.3d at 287. Because the Ryes have expert proof that Mrs. Rye's Rh-sensitization is more likely than not to result in future medical expenses, the Defendants have neither affirmatively negated an element of the Ryes' claim nor otherwise demonstrated that Mrs. Rye will be unable to prove future damages at trial.[17] Even under the federal standard for summary judgment, the Defendants have not shown that the Ryes' evidence is insufficient to prove the existence of future harm to Mrs. Rye during any future pregnancies.

As stated, the jurisdictions recognizing a claim based on Rh-sensitization agree that the injury accrues at the time a RhoGAM injection should have been administered, even when the amount of future damages is uncertain. See Dahl v. St. John's Hosp., No. 89-1784, 1990 WL 96045, at *4 & n.3 (Wis. Ct. App. Apr. 24, 1990) (holding that the plaintiff's injury and cause of action accrued at the time of the defendant's alleged "failure to administer a RhoGAM injection within approximately three days of the first child's birth[, which] began the process of Rh factor sensitization that impaired [the plaintiff's] ability to have healthy children in the future"); accord Ford v. Guaranty Nat'l Ins. Co., No. 1:93CV213-S-D, 1997 WL 786767, at *6 (N.D. Miss. Nov. 26, 1997); Kenyon, 688 P.2d at 967; Simmons v. Riverside Methodist Hosp., 336 N.E.2d 460, 461, 464 (Ohio Ct. App. 1975). Because an Rh-sensitized claimant who fails to file suit until a future pregnancy actually causes complications would likely be barred by the statute of limitations, these other jurisdictions have recognized that the suit must be filed as soon as

---

[17] Contrary to the assertion by the majority, I have not "harvested from the record only those facts supporting [my] favored result." A thorough review of the deposition testimony and affidavits by the competing medical experts, when properly viewed in the light most favorable to the Ryes, leads to only one plausible conclusion—the Defendants have not disproven the opinion of Mrs. Rye's expert that she is more likely than not, as a result of her Rh-sensitized condition, to incur medical expenses related to a future pregnancy.

the claimant learns that the medical provider failed to administer the necessary RhoGAM injection.  See, e.g., Dahl, 1990 WL 96045, at *4-5 (recognizing that despite "the inequity and potentially significant social effects of a decision that requires litigation of claims before the ultimate damage is known," the plaintiff's "claim . . . existed . . . when the RhoGAM was not administered," and "[a] claim for damages for future complications is recognized at law if the jury can adequately assess the probability of future damages"). This Court should follow the lead of the other states and recognize the viability of this claim.  If Mrs. Rye does become pregnant in the future and suffers the very complications Dr. Bruner has identified as more than likely to occur, those responsible for her injury will escape accountability by virtue of our one-year statute of limitations in health care liability actions.  Under these circumstances, I cannot agree that summary judgment is appropriate on this issue.

### D. Future Medical Expenses Related to Future Blood Transfusions

Unlike Mrs. Rye's claim for medical expenses related to future pregnancies, the existence of future expenses related to any future blood transfusions is too remote and uncertain to survive summary judgment.  In support of their motion for summary judgment, the Defendants offered the affidavit of their expert witness, Dr. Stovall, who opined "within a reasonable degree of medical certainty that it is more likely than not that an Rh-sensitized individual will never sustain any injuries or damages whatsoever."  In response, the Ryes offered the affidavit and deposition testimony of their expert, Dr. Bruner, who stated only that Mrs. Rye was at an "increased risk of life-threatening problems" if she were to be involved in some "medical emergency" that would "require[] an urgent or emergent blood transfusion as a life-saving procedure."  Testimony by Dr. Bruner that Mrs. Rye's condition "is likely to be life threatening in an emergency situation in which blood transfusions are required" does not establish the degree of probability required to support a claim for future damages.  See Singh, 390 S.W.3d at 287.  In fact, Dr. Bruner conceded that he could not testify that Mrs. Rye would more probably than not require a blood transfusion in the future.  Thus, the Defendants have affirmatively negated the Ryes' claim that future medical expenses related to blood transfusions are reasonably certain to occur, and the Ryes have been unable to respond with any evidence establishing the existence of a genuine issue for trial.  I agree, therefore, that summary judgment, under either the Byrd/Hannan standard or the Celotex/federal standard, should be granted in favor of the Defendants on this issue.

### E. Emotional Distress of Mr. Rye

Initially, I agree with the assessment by my colleagues and the Court of Appeals that "[t]he trial court properly concluded that Mr. Rye's claim for negligent infliction of emotional distress is a 'stand alone' claim, requiring expert proof to prevail **at trial**." Rye, 2014 WL 903142, at *24; see Camper v. Minor, 915 S.W.2d 437, 446 (Tenn. 1996).

Recognizing that Mr. Rye has failed to identify any expert who would testify at trial that he has suffered a severe emotional injury, the majority concludes that summary judgment for the Defendants is appropriate because "Mr. Rye lacks proof of an essential element of his claim." As indicated, the Court of Appeals reversed the trial court's grant of summary judgment on this issue, relying solely upon the interpretation of Hannan as expressed in the Target footnote. Rye, 2014 WL 903142, at *23-24; see also Boals, 2013 WL 5872225, at *5. In my view, even under the Byrd/Hannan standard, the Defendants are entitled to summary judgment because they have affirmatively demonstrated that Mr. Rye will be unable to prove his emotional distress claim at trial. This issue presents the perfect opportunity to clarify how the second prong of Hannan should work in practice.

Applying an interpretation of Hannan as expressed by the Court of Appeals and the majority of this Court, summary judgment is not appropriate even where, as here, a claimant has failed to identify a requisite expert witness within the established discovery deadlines. In my view, however, the phrase "at trial," as used in Hannan, was never intended to relieve claimants from the responsibility to comply with discovery deadlines. In this instance, the Defendants did well to obtain a scheduling order from the trial court which established "firm cut-off dates for completion of discovery and exchange of evidence." Cornett, 77 Tenn. L. Rev. at 334 n.198. Expert proof is required to support a stand-alone claim for emotional distress, but Mr. Rye failed to identify, within the discovery deadlines set by the trial court, an expert witness who could corroborate the viability of his claim. In consequence, the Defendants have satisfied the second prong of the Hannan standard by showing at the summary judgment stage, after the discovery deadlines, that Mr. Rye cannot prove his claim at trial. See id.; see also McDaniel, 2009 WL 1211335, at *13-15 (explaining that the defendant was entitled to summary judgment because the plaintiffs had failed to identify a qualified expert witness within the time established by the trial court's scheduling order). Thus, while I would apply the standard articulated in Byrd, Hannan, and their progeny, rather than the newly adopted federal standard, I agree with the majority that on this issue, summary judgment should be granted in favor of the Defendants.

### F. Disruption of Family Planning
Finally, I agree with the majority that Tennessee does not recognize a stand-alone claim for "disruption of family planning." See Rye, 2014 WL 903142, at *13-16. As both the trial court and Court of Appeals correctly concluded, however, the Ryes should be allowed to present evidence of the disruption of their family plans as a part of the physical and emotional damages associated with Mrs. Rye's Rh-sensitization. As stated, the Ryes have alleged physical injuries in the form of Mrs. Rye's altered blood status and the "disruption of the normal functioning of [her] capability to conceive unimpaired, healthy children, free from an abnormally high risk of birth defects or premature fetal death." They have also alleged emotional injuries in the form of Mrs. Rye's daily

concerns and anxiety about the significant impairment of her ability to engage in regular sexual activity with her husband or to conceive more children. As indicated, courts in other jurisdictions have recognized these theories of recovery for claimants who have become Rh-sensitized due to the negligence of a medical provider. In consequence, I would reinstate the ruling of the trial court on this issue and allow Mrs. Rye to present evidence at trial of the disruption of her family planning, but only as a part of her claim of physical and emotional damages.

In summary, I believe that the Ryes should be able to proceed to trial on three of their claims: (1) whether Mrs. Rye's condition of Rh-sensitization has caused her harm in the form of a present physical injury; (2) whether Mrs. Rye's Rh-sensitization has caused her harm in the form of emotional distress; and (3) whether Mrs. Rye's Rh-sensitization is reasonably certain to cause her prospective harm related to future pregnancies. I would allow the Ryes to present evidence of the disruption of their family planning, but only as a part of their alleged physical and emotional damages. By granting summary judgment on these three issues, my colleagues have deprived the Ryes of any opportunity to have their claims resolved on the merits by a jury of their peers. In consequence, the Defendants responsible for failing to comply with the recognized standard of care in the profession cannot be held accountable.

### III. Separation of Powers

Because I would have upheld the principles established in <u>Byrd</u> and refined in <u>Hannan</u>, I have chosen to generally address, without attempting to resolve, the constitutional issue which has been preempted by the decision of my colleagues to overrule the <u>Byrd</u>/<u>Hannan</u> standard in this case, a case which pre-dated the passage of Tennessee Code Annotated section 20-16-101 purporting to change the summary judgment standard in Tennessee. <u>See</u> Matthew R. Lyon & Judy M. Cornett, <u>*Hannan*, The "Zombie Case": Will the Tennessee Supreme Court Drive a Stake Through Its Heart?</u>, Dicta, Dec. 2014, at 13 (questioning why the Court would grant review in <u>Rye</u>, other than to "moot any constitutional challenge to [section 20-16-101]," because "the <u>Hannan</u> standard is already on its way out" and "[t]he lower courts seem to be applying both <u>Hannan</u> and the statute appropriately").[18]

---

[18] In his separate opinion, Justice Bivins attempts to minimize the separation-of-powers issue by asserting that if the underlying motive of the majority really is to acquiesce to the summary judgment standard adopted by the General Assembly, it would "have been much easier to avoid this case and simply affirm the constitutionality of . . . section 20-16-101 in an ultimate constitutional challenge." That statement is troubling. Initially, it is always easier to avoid a constitutional challenge than to address the claim on the merits. Secondly, his assertion that the Court could "simply affirm the constitutionality of . . . section 20-16-101" is indicative of the belief that this Court can reach whatever result it desires in any

The Federalist Papers, a collection of eighty-five essays authored by Alexander Hamilton, James Madison, and John Jay, were designed to influence the states' adoption of the U.S. Constitution. Federalist Paper No. 78, far and away the most cited of the papers by the U.S. Supreme Court, lays the groundwork for the powers granted to the judiciary and broadly addresses the powers of each of the three branches of government:

> Whoever attentively considers the different departments of power must perceive, that, in a government in which they are separated from each other, the judiciary, from the nature of its functions, will always be the least dangerous to the political rights of the Constitution; because it will be least in a capacity to annoy or injure them. The Executive not only dispenses the honors, but holds the sword of the community. The legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. The judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever. It may truly be said to have neither FORCE nor WILL, but merely judgment; and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments.

> This simple view . . . proves incontestably, that the judiciary is beyond comparison the weakest of the three departments of power; that it can never attack with success either of the other two; and that all possible care is requisite to enable it to defend itself against their attacks. It equally proves, that though individual oppression may now and then proceed from the courts of justice, the general liberty of the people can never be endangered from that quarter . . . so long as the judiciary remains truly distinct from both the legislature and the Executive. . . . "[T]here is no liberty, if the power of judging be not separated from the legislative and executive powers." . . . [F]rom the natural feebleness of the judiciary, it is in continual jeopardy of being overpowered, awed, or influenced by its co-ordinate branches . . . .

> The complete independence of the courts of justice is peculiarly essential in a limited Constitution[,] . . . one which contains certain

---

given case—a notion disconcerting to anyone who believes that a fundamental obligation of this Court is to apply the established rule of law.

specified exceptions to the legislative authority; such, for instance, as that it shall pass no bills of attainder, no *ex-post-facto* laws, and the like. Limitations of this kind can be preserved in practice no other way than through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing.

The Federalist No. 78 (Alexander Hamilton).[19]

The U.S. Constitution served as a model for the founders of the Tennessee Constitution, which even more specifically contemplates a balance of powers among our three branches of government. Article II, section 1 provides, "The powers of the Government shall be divided into three distinct departments: the Legislative, Executive, and Judicial." Article II, section 2 elaborates, "No person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted." While there are no precise lines of demarcation in the respective roles of our three branches of government, the traditional rule is that "the legislative [branch has] the authority to make, order, and repeal [the laws], the executive . . . to administer and enforce, and the judicial . . . to interpret and apply." Underwood v. State, 529 S.W.2d 45, 47 (Tenn. 1975) (quoting Richardson v. Young, 125 S.W. 664, 668 (Tenn. 1910)). By the terms of our constitution, "[o]nly the Supreme Court has the inherent power to promulgate rules governing the practice and procedure of the courts of this state, and this inherent power 'exists by virtue of the [Constitution's] establishment of a Court and not by largess of the legislature.'" State v. Mallard, 40 S.W.3d 473, 480-81 (Tenn. 2001) (citation omitted) (quoting Haynes v. McKenzie Mem'l Hosp., 667 S.W.2d 497, 498 (Tenn. Ct. App. 1984)). In this context, this "[C]ourt is supreme in fact as well as in name." Barger v. Brock, 535 S.W.2d 337, 341 (Tenn. 1976).

Based upon these principles, but taking into account considerations of comity among the three branches of government, this Court has exercised measured restraint by repeatedly holding that "[a] legislative enactment which does not frustrate or interfere with the adjudicative function of the courts does not constitute an impermissible

---

[19] "The dignity and stability of government in all its branches, the morals of the people, and every blessing of society depend so much upon an upright and skillful administration of justice, that the judicial power ought to be distinct from both the legislative and executive, and independent upon both . . . ." John Adams, Thoughts on Government (1776), *reprinted in* 4 The Works of John Adams 198 (Charles Francis Adams ed., 1851), *available at* http://oll.libertyfund.org/titles/2102.

encroachment upon the judicial branch of government." Lynch v. City of Jellico, 205 S.W.3d 384, 393 (Tenn. 2006) (alteration in original) (quoting Underwood, 529 S.W.2d at 47). "It is only by remembering the limits of the power confided to the judicial department of the government, and respecting the independence of the other departments, that the judiciary can maintain its own independence in the proper sense of the term[.]" State ex rel. Robinson v. Lindsay, 53 S.W. 950, 952 (Tenn. 1899). Thus, this Court will typically consent to rules of procedure that are promulgated by the legislature as long as they "(1) are reasonable and workable within the framework already adopted by the judiciary, and (2) work to supplement the rules already promulgated by the Supreme Court." Mallard, 40 S.W.3d at 481.

If the majority had maintained the viability of the Byrd/Hannan standard, this Court would have eventually been called upon to determine whether Tennessee Code Annotated section 20-16-101 is reasonable and workable within the burden-shifting framework articulated in Byrd, Hannan, and the many other opinions of this Court over the last twenty-two years, and whether the statute works to supplement those summary judgment rules already promulgated by this Court. See, e.g., Cooper v. Robert Ledford Funeral Home, Inc., No. E2013-00261-COA-R10-CV, 2013 WL 3947758, at *3 n.5 (Tenn. Ct. App. July 29, 2013) (applying section 20-16-101 but noting the "unraised question as to the constitutionality of [the statute]"). By using the Ryes' case to overrule Hannan and adopt the federal standard, my colleagues have preempted any future consideration of this important constitutional question. In consequence, we are unable to address the issue of whether the General Assembly has created or amended a rule of procedure in such a way that "strike[s] at the very heart of [this] [C]ourt's exercise of judicial power." Mallard, 40 S.W.3d at 483.[20]

"The same rule that teaches the propriety of a partition between the various branches of power, teaches us likewise that this partition ought to be so contrived as to render the one independent of the other." The Federalist No. 71 (Alexander Hamilton). I fear that today my colleagues have preempted our consideration of this important principle by surrendering the constitutional authority of this Supreme Court to establish summary judgment standards for the judiciary. See Judy M. Cornett & Matthew R.

---

[20] Although the majority insists that "[b]y our decision in this appeal we cannot preempt a constitutional challenge to a statute that does not apply in this appeal," this is precisely what has occurred, regardless of whether that was the intended result. By granting review in this case, overruling the common law as relied upon by the parties and the courts, and retroactively applying the federal standard as adopted by the General Assembly years after the events underlying the Ryes' claim, the majority has indeed sidestepped consideration of whether the legislature's enactment of this procedural rule would pass constitutional scrutiny.

Lyon, <u>Contested Elections as Secret Weapon: Legislative Control over Judicial Decision-making</u>, 75 Alb. L. Rev. 2091, 2095-98 & n.33 (2012) (describing "an inter-branch game of 'chicken'" being played out between the General Assembly and the Tennessee Supreme Court over the issue of who has the power to determine the summary judgment standard for Tennessee).  The fundamental responsibility of an independent judiciary is to protect against the unwarranted intrusion of the legislative branch.  I would reaffirm the ruling in <u>Hannan</u> and, **if** raised in a future case, confront head-on the separation-of-powers issue.[21]

### IV. Conclusion

Because the <u>Byrd</u>/<u>Hannan</u> standard embraces the basic principle of resolution of disputes on the merits and the constitutional right to trial by jury, the Tennessee rule is preferable to that adopted by our federal courts in <u>Celotex</u>.  Under either standard, however, I believe that three components of the Ryes' complaint should proceed to trial.  Through inadvertence or otherwise, the majority has inappropriately weighed the evidence at the summary judgment stage and deprived the Ryes of a trial on the merits of their claims.

_____
GARY R. WADE, JUSTICE

---

[21] Contrary to the assertions in the separate opinion filed by Chief Justice Lee, I have not suggested that the Court maintain the <u>Byrd</u>/<u>Hannan</u> standard for the purpose of manufacturing a separation-of-powers issue.  In my view, the General Assembly created the separation-of-powers issue, and the majority's abandonment of a workable summary judgment standard compromises, rather than upholds, the independence of the judiciary.